UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 2020-_____

ZEN GROUP, INC., and
CARLOS OTAMENDI,

      Plaintiffs,

vs.

STATE OF FLORIDA, AGENCY FOR
HEALTH CARE ADMINISTRATION, and
MARY C. MAYHEW, Secretary, State of Florida,
Agency for Health Care Administration, in her
official capacity, and KELLY A. BENNETT,
individually and in her official capacity as Chief
of the Office of Medicaid Program Integrity within
the State of Florida, Agency for Health Care
Administration,

      Defendants.

_____/

## COMPLAINT FOR DECLARATORY JUDGMENT AND FOR DAMAGES

      Plaintiffs, Zen Group, Inc. ("Zen Group") and its owner Carlos Otamendi, bring

this action pursuant to section 1983 of Title 42 of the United States Code, seeking a

judgment declaring certain practices of the Defendants to be unconstitutional under the

First Amendment to the United States Constitution, and for an award of damages for the

losses occasioned by the constitutional violations committed by these Defendants, as well

as for pendent state law claims, and allege:

### INTRODUCTION

      1.     This story of government abuse of power and the devastation it has caused

a Florida Medicaid provider of services to developmentally-disabled minors begins in

2017 with the flawed and inadequate way leadership at the State of Florida Agency for Health Care Administration ("Agency" or "AHCA") implemented its Behavior Analysis services program (Provider Type 39), including AHCA's failure to staff the enrollment process adequately, the reimbursement rates AHCA adopted and later regretted, and the overreaching to which AHCA resorted to try to recoup moneys it paid out.

2.      In an effort to cover up its ineptitude in implementing and administering the Behavior Analysis services program, and to attempt to restore its budget, in 2018, the Agency scrambled to recoup payments from numerous providers it had paid under the program (including Zen Group) by any means necessary, including issuing overpayment demands based on newly-created retroactively-applied provider qualifications imposing myriad requirements not included in the duly adopted Agency rules or the coverage policies incorporated therein.

3.      With full knowledge that it had all times acted lawfully and appropriately in providing important services to children requiring behavioral services, Zen Group refused to capitulate.   Instead, Zen Group exercised its First Amendment right to challenge AHCA's overpayment demand – the Agency's attempt to recoup monies paid to Zen Group for necessary services Zen Group duly provided to vulnerable children – and substantially prevailed, in the end agreeing to a settlement, to avoid the expense of continued litigation with no finding of fault and no sanctions, that permitted the Agency to retain approximately $70,000 it had withheld – a far cry from the $1,644,402.69 the Agency demanded – and required the Agency to pay back to Zen Group nearly $667,000 in withheld funds.

4.     In the course of the administrative proceedings in Zen Group's challenge to the Agency's overpayment demand, in a Motion For Sanctions served on the Agency, Zen Group laid bare its scathing criticism of the Agency's Behavior Analysis service program implementation and administration, and the Agency's improper and unlawful attempts to claw-back money through non-rule policies created in an ad hoc, arbitrary and capricious manner.  Because Zen Group had the audacity to challenge the Agency, to fight the Agency's unjustified and outrageous overpayment demand, to exercise its First Amendment right to seek redress of its grievances, and because Zen Group was brazen enough to criticize the Agency, expose its mistakes and misconduct, and threaten to seek sanctions against the Agency – then, ultimately prevailed – Zen Group and its owner Carlos Otamendi drew the ire of the Agency and its employees, foremost among them, Kelly A. Bennett, Chief of the Agency's Office of Medicaid Program Integrity at AHCA.

5.     The day after the Agency paid Zen Group the nearly $667,000 it owed Zen Group under the settlement agreement – *the very next day* – AHCA's Kelly A. Bennett, who was at the center of the administrative proceedings on the Agency's overpayment demand, embarked on a course of conduct to retaliate against Zen Group and to put Zen Group out of business – a devious plan designed to deprive Zen Group of any forum whatever to challenge Ms. Bennett's actions, clear the Zen Group name, or restore its business.  Ms. Bennett's unlawful, unconstitutional, and retaliatory conduct cast Zen Group into a dark purgatory no less labyrinthine and oppressive than that famous netherworld devised by Franz Kafka, himself once the head of a department of an administrative agency.

6.      At this time, it is not clear whether and which other employees of AHCA and/or employees of the Florida Office of the Attorney General's Medicaid Fraud Control Unit have joined in Ms. Bennett's unlawful and unconstitutional conduct or conspired with her.

## PARTIES AND JURISDICTION

7.      This suit is brought pursuant to 42 U.S.C. § 1983, which states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

8.      At all times material to this Complaint, Defendant State of Florida, Agency for Health Care Administration was the Florida state agency responsible for administration of the Florida Medicaid program.

9.      AHCA's organizational structure includes the "Office of Medicaid Program Integrity" ("MPI"), within the Division of Health Quality Assurance.  MPI is responsible for overseeing the activities of Medicaid providers, for addressing fraudulent and abusive practices, and for recovering overpayments and imposing sanctions as appropriate in accordance with the provisions of Section 409.913 of the Florida Statutes and Rule 59G-9.070 of the Florida Administrative Code.  MPI conducts reviews, investigations, analysis, and audits using MPI staff as well as outside contractors. MPI also has the authority to make referrals to the Medicaid Fraud Control Unit ("MFCU") of the Florida Office of Attorney General, *inter alia*, when it finds verified credible allegations of fraud.

10.     At all times material to this Complaint, Defendant Mary C. MAYHEW was the Secretary of the Agency for Health Care Administration. As Secretary, she is responsible, pursuant to Florida Statutes 20.19 (2), for the general supervision and operation of AHCA, including oversight of the operations of MPI and the lawful, proper, ethical operation and administration of the Medicaid program. As Secretary, Defendant Mayhew is also responsible for ensuring that AHCA's mission and duties are fulfilled in accordance with State and Federal laws, rules, and regulations. She is being sued only in her official capacity.

11.     Defendant, Kelly A. Bennett (hereafter "Bennett") at all times material to this Complaint was and is an AHCA employee in the position of Chief of the Agency's Office of Medicaid Program Integrity, within the Agency's Division of Health Quality Assurance.

12.     Defendant Bennett was the person responsible for the MPI referral of the Zen Group to the MFCU of the Office of Attorney General and responsible for imposing the suspension of Medicaid payments to Zen Group purportedly pursuant to 42 C.F.R. § 455.23.  Defendant Bennett had the authority to make referrals to the MFCU based on verified credible allegations of fraud and to suspend Medicaid payments to providers based on verified credible allegations of fraud.  Referrals to MFCU were to be made in good faith and only in the event that there was actual, factually supported verified credible allegations of fraud.  Defendant Bennett had the ongoing duty to assess, review, screen, and evaluate all relevant and available information in performance of her duties related to the referral of Medicaid providers for fraud investigation and suspension of Medicaid payments.  Defendant Bennett also had, *inter alia*, a duty to ensure that her

powers and authority were carried out reasonably and competently, in good faith and without any reckless and/or deliberate indifference to the rights of the Plaintiff Zen Group or abuse of the respective obligations of both the Medicaid program and Zen Group State and Federal law, and per the contractual provisions of the applicable Medicaid provider agreement.

13.     At all times material to this Complaint, Plaintiff Carlos Otamendi, owner of Zen Group, was a citizen of the State of Florida, residing in Miami-Dade County, Florida.

14.     At all times material to this Complaint, Plaintiff Zen Group was a citizen and resident of Florida, with its principle place of business in Miami-Dade County, Florida.

15.     At all times material to this Complaint, Plaintiff Zen Group was a Medicaid provider in the State of Florida, Provider Number 017453000, providing Behavior Analysis services to developmentally-disabled Medicaid recipients.

16.     At all times material to this Complaint, Plaintiff Zen Group and Defendant AHCA were parties to a Non-Institutional Medicaid Provider Agreement.

17.     This Court has "federal question" jurisdiction pursuant to 28 U.S.C. § 1331 to hear cases arising under the laws and Constitution of the United States, under 28 U.S.C. § 1343(3) to redress the deprivation under color of state law of any right, privilege or immunity secured by the Constitution, and under 28 U.S.C. § 1343(4) to secure equitable or other relief for the protection of civil rights.

18.     The Court has the authority to issue declaratory judgments pursuant to 28 U.S.C. §§ 2201 and 2202.

19.     The Court may enter an award of attorney's fees pursuant to 42 U.S.C. § 1988.

20.     This Court has supplemental jurisdiction pursuant to 42 U.S.C. § 1367 over the Florida state law claims brought here because the latter arise out of the same conduct and are so related to the claims over which this Court has original jurisdiction as to form part of the same case or controversy under Article III of the United States Constitution.

21.     This Complaint seeks declaratory relief to prevent violations of the Plaintiffs' rights, privileges and immunities under the Constitution of the United States and 42 U.S.C. §§ 1983 and 1988, specifically seeking redress for the deprivation under color of state statute, ordinance, regulation, custom or usage of rights, privileges, and immunities secured by the Constitution and laws of the United States.  The rights sought to be protected in this cause of action arise and are secured under the First Amendment to the Constitution.

22.     This action seeks a judicial determination of issues, rights and liabilities embodied in an actual and present controversy between the parties involving the constitutionality of certain retaliatory actions taken by the Defendants. There are substantial bona fide doubts, disputes, and questions that must be resolved concerning the Defendants' actions taken under color and authority of "state" law and procedures, in violation of Plaintiffs' rights under the First Amendment to the United States Constitution.

23.     Venue is proper in this District as all causes of action accrued in this jurisdiction. Plaintiffs Zen Group and Carlos Otamendi are residents of the Southern

District of Florida and conduct all business operations in the Southern District of Florida, and all actions and conduct of Zen Group purportedly justifying Defendants' payment suspension took place in the Southern District of Florida.

## BACKGROUND AND GENERAL ALLEGATIONS

24.    On February 14, 2019, the Florida Agency for Health Care Administration issued a Final Audit Report ("FAR") in MPI Case No. 2017-0008629, demanding that Zen Group pay to the Agency $1,644,402.69 on the basis of the Agency's assertion that Zen Group was overpaid $1,376,226.46 for services not covered by Medicaid. Specifically, the Agency's FAR claimed that "Florida Medicaid Behavior Analysis Services" Zen Group provided to Medicaid recipients and for which Zen Group billed Medicaid were "rendered by an individual determined not to meet the qualifications or for whom documentation was insufficient to determine eligibility."  FAR at 3 (a copy of the FAR is attached as Exhibit "A" to this Complaint).

25.    Zen Group vehemently opposed the Agency's assertions, maintained that all of its providers met the criteria set out in Agency rules, regulations, and guidance, and on March 7, 2019, within the 21 days permitted, Zen Group exercised its right to seek administrative review pursuant to Section 120.569 of the Florida Statutes, by filing a Petition For Formal Hearing.

26.    The State of Florida Division of Administrative Hearings assigned the Agency's case against Zen Group Case Number 19-003228MPI, and hearing was initially set for October 29-31, 2019.  On August 15, 2019, the hearing was rescheduled for January 14-16, 2020.

27.     During the pendency of the administrative action, Zen Group continued to provide services to Medicaid patients, and the Agency withheld payments to Zen Group for services rendered to Medicaid patients by Zen Group unrelated to the Agency's claims in the FAR.

28.     Discovery proceeded in the administrative action, and documentary and testimonial evidence confirmed Zen Group's position that the Agency's new Behavior Analysis Services program was fraught with confusion and missteps, and that the Agency was attempting through its FAR to impose arbitrary, *post hoc*, non-rule requirements on Zen Group related to the qualifications and documentation of some of its Behavior Analysis Services providers.

29.     On October 15, 2019, Zen Group served on the Agency a Motion For Sanctions pursuant to Section 120.57 of the Florida Statutes.  Besides setting out the specific qualifications and documentation for each of the 28 Zen Group providers at issue, this Sanctions Motion set out in detail the vague Agency regulations on qualifications and documentation, and the Agency's arbitrary and capricious efforts to retroactively adopt a non-rule policy and to impose it unlawfully on Zen Group through the FAR.  A copy of this Motion for Sanctions (without attachments) is attached as Exhibit "B" to this Complaint.

30.     Zen Group's Motion for Sanctions laid bare how, from the outset, the Behavior Analysis Services Coverage Policy was wholly mismanaged by AHCA to the detriment of Medicaid providers, Medicaid recipients, and Florida taxpayers. The Motion for Sanctions chronicled the grossly negligent manner in which AHCA rolled out the Behavior Analysis services program, the reimbursement rates it adopted and later

regretted, and its failure to staff the provider enrollment process adequately. This information was highly critical of AHCA. AHCA did not want this highly critical information made public. Indeed, AHCA had previously suspended an AHCA employee for criticizing the Behavior Analysis services program.[1] To be sure, the facts set forth in the Motion for Sanctions were embarrassing for upper level management at AHCA, especially Defendant Bennett, and as set forth below, prompted AHCA to scramble to settle this case (on extremely favorable terms for Zen Group) to avoid embarrassment.

31.     Pursuant to Section 57.105, the Sanctions Motion had to be served on the Agency at least 21 days before being filed, in order to provide the Agency an opportunity to withdraw its sanctionable claims during this safe-harbor period. AHCA officials, including Defendant Bennett, were aware of Zen Group's highly critical Sanctions Motion.

32.     At the time the Sanctions Motion was served on the Agency, the Agency had collected over $737,000.00 from Zen Group in withheld payments for services rendered by Zen Group to Medicaid patients unrelated to the Agency's overpayment demand.

---

[1] The suspended AHCA employee, Roberta Brewer, had publicly stated: "There is not a whole panel of people reviewing these app[lication]s. There is only me. I am the only person reviewing over 3000 applications and having to do so without any clear guidelines or lists of approved degrees or work experience examples from Medicaid policy, just some very vague guidelines and wording on an attestation sheet. I am certainly not being arbitrary when reviewing these files. I am trying to the best of my knowledge and ability to review these files and make as educated a decision as I can. There is no malice or arbitrary decision making going on. Just a single woman, who is trying to do her job with one hand tied behind her back. It is just as frustrating for me to have been doing these app[lication]s for nearly 2 years, and to have been asking for guidelines [from AHCA officials] all that time and yet given nothing. . . ."

33.     During the week after Zen Group's Sanctions Motion was served on AHCA, the parties engaged in settlement discussions.  The parties agreed without much difficulty that (1) the Agency would be permitted to retain approximately $70,000.00 of the money AHCA had withheld from Zen Group (as Zen Group stated, "only to avoid continued litigation costs") and AHCA would pay back to Zen Group over $665,000.00, (2) the money retained by the Agency would not be characterized as "an overpayment," and (3) the Agency would remove any fines or sanctions, as Zen Group maintained it had at all times acted lawfully and had not engaged in any sanctionable conduct.

34.     The major point of contention in the settlement discussions was Zen Group's desire to include a non-retaliation provision in any settlement agreement.  On October 25, 2019, counsel for Zen Group wrote to counsel for the Agency as follows:

> As I mentioned to you in my October 22 email because my client and its ownership continue to be regulated by AHCA, my client needs assurances that the Agency will not take any adverse action based on the fact of this settlement, its terms, or any of the conduct underlying this case.  Consider this proceeding, if you can, from the perspective of my client, whose ownership believed it was acting, and attempted to act, properly and honestly at all times.  This has been a difficult, expensive, and intimidating process.  To be wrongfully accused is a burden.
>
> I appreciate your statement that this settlement "has no impact" on my client's and its ow[n]ership's participation in the Medicaid program.  While I understand my client's rights and responsibilities remain governed by the Provider Agreement, as you say in you letter, we both know that the Provider Agreement is administered by human beings who have some discretion and may be governed by passions and prejudices.  A contract such as a settlement agreement cannot solve all the problems that arise from human emotions, but it can do something.  Here, where this experience has given my client some basis to doubt the Agency's motives and good faith, a simple non-retaliation clause in the settlement agreement would go a long way toward allaying these concerns.
>
> We propose adding a paragraph, in between paragraphs 13 and 14 in the proposed settlement agreem[e]nt the Agency transmitted yesterday,

October 24, 2019, that reads as follows:  The State of Florida, Agency for Health Care Administration, and its employees, agents, representatives, and attorneys shall not retaliate against, or take any adverse action aga[ins]t, PROVIDER [Zen], its owner Carlos Otamendi, or any entity owned or controlled by Mr. Otamendi, including, Our Kids Home, Inc., or Zenaida Hechevarria [Otamendi], on the basis of this settlement, or the conduct that is the subject of the Final Audit Report dated February 14, 2019, or the pre-hearing proceedings in Case No. 18-5073MPI in the State of Florida Division of Administrative Hearings.

October 25, 2019, Email from Anthony C. Vitale to Joseph Hern (attached as Exhibit "C" to this Complaint).

35.    Ultimately, the Agency refused to agree to a non-retaliation clause, noting that "such relief is not available" even by order of an administrative law judge through a hearing in the Division of Administrative Hearings.

36.    On October 29, 2019, relying on the Agency's and its personnel's good faith not to unlawfully retaliate against Zen for exercising its right to administrative review and for identifying myriad grave problems in the Agency's Behavior Analysis Services Program, in order to avoid the expense of continued litigation, Zen Group executed a settlement agreement with the Agency.

37.    On October 30, 2019, the Agency filed in the Division of Administrative Hearings a Joint Motion For Relinquishment of Jurisdiction, indicating "the terms of the Settlement Agreement are fully agreed upon and AHCA is in the process of obtaining the necessary signatures for complete execution."

38.    On November 21, 2019, the Agency issued a Final Order indicating: "THE PARTIES resolved all disputed issues and executed a Settlement Agreement.  The parties are directed to comply with the terms of the attached settlement agreement.  Based

on the foregoing, this file is **CLOSED**." Final Order, DOAH Case No. 19-3228MPI, MPI Case No. 2017-0008629.

39.     The final Settlement Agreement required the Agency to pay to Zen Group $666,980.70. Settlement Agreement, DOAH Case No. 19-3228MPI, MPI Case No. 2017-0008629.

40.     On January 9, 2020, the Agency paid to Zen Group the amount due under the Settlement Agreement. *See* Two Checks from State of Florida to Zen Group totaling $666,980.70 (attached as Exhibit "D" to this Complaint)

The *Very Next Day* AHCA and Bennett Suspend Payments To Zen Group In Retaliation For Zen Group's Exercise Of Its First Amendment Right To Criticize AHCA And Exercise Of Its First Amendment Right To Petition The Government For Redress In Challenging AHCA's Unfounded Overpayment Demand

41.     The very next day, January 10, 2020, over the signature of Defendant Bennett, Chief of the Agency's Division of Medicaid Program Integrity, the Agency suspended Medicaid payments to Zen Group purportedly "pursuant to 42 C.F.R. §455.23."

42.     Section 455.23 of title 42 of the Code of Federal Regulations requires or permits a "State Medicaid agency" to "suspend all Medicaid payments to a provider after the agency determines there is a credible allegation of fraud for which an investigation is pending . . . ."

43.     The Agency's January 10, 2020, suspension letter (received by Zen Group only after its counsel contacted Bennett by email on January 13, 2020) does not state explicitly that the Agency had determined there was a credible allegation of fraud. It stated only that "general allegations include billing for services not rendered."

44.     Over the next several weeks, Zen Group and its counsel learned that Medicaid Fraud Control Unit Investigator Pedro Pidermann was conducting an investigation.

Zen Group Immediately Provides Complete Information And Offers To Cooperate Fully In MFCU's Investigation

45.     Zen Group, through its counsel, communicated to MFCU Investigator Pidermann that Zen Group would fully cooperate in any investigation, would speak with the investigator, and would provide any information and documentation requested to expedite resolution of the investigation.

46.     On January 23, 2020, MFCU Investigator Pedro Pidermann requested documents from Zen Group.  The same day, January 23, 2020, Zen Group, through its counsel, provided 29 categories of responsive documents to the MFCU investigator Pedro Pidermann.  *See* January 23, 2020 Email from Peter Suarez, paralegal for Anthony C. Vitale, counsel for Zen Group, to MFCU Investigator Pedro Pidermann (a copy of which is attached as Exhibit "E" to this Complaint).

47.     On the morning of January 27, 2020, counsel for Zen Group provided to MFCU Investigator Pedro Pidermann a detailed six-page memorandum summarizing testimonial proof that could be provided and listing nine witnesses and what they would testify to, as well as myriad documentary proof that conclusively established Zen Group did not commit any fraud with regard to the subject of the investigation.  On this date, Zen Group, through its counsel, again offered to cooperate and be interviewed by investigators.

48.     Zen Group did not in fact commit any fraud and AHCA and Bennett were aware that Zen Group did not commit any fraud.

49.     Documentary and testimonial evidence gathered by MFCU and provided by Zen Group establishes Zen Group did not commit any fraud.

50.     On January 28, 2020, Zen Group, through its counsel, sent to the Agency's Bennett the six-page memorandum it had prepared for MFCU Investigator Pidermann identifying relevant witnesses (with summaries of their testimony) and documents, along with an email message stating:

> As you can see from the attached, we've undertaken an expedited internal investigation and have been in touch with MFCU's Luis Martinez and Investigator Pedro Pidermann regarding the Zen suspension, attached.  Relevant records were requested by MFCU and immediately provided.  See email attached.  We have advised both Luis Martinez and Pedro Pidermann that the owners will meet with them for an interview and are available to provide any and all information needed.  The company is fully cooperating as you can see from Anthony's email below.  The client [has] not committed fraud.  I'm writing you today in the hopes that you will confirm that, in line with MFCU's statement, that the basis for the "services not rendered" suspension and complaint/referral on or about 12/17/2019 is regarding recipient C[.] A[.].  We are asking you to confirm this.  With this confirmation, we will submit a written explanation regarding MPI's "Services Not Rendered" basis for suspension/referral in accordance with the federal suspension regulation to demonstrate "good cause" by means of multiple witness testimony, documents, text messages etc. that no fraud exists.  This will permit you under the reg to exercise your discretion and find "good cause" and to lift the suspension, in whole or in part.  We need to right this mistake as soon as possible before this good company is forced to close its doors.  Thanks.

*See* January 28, 2020 (12:14 p.m.) Email from Christopher Parrella of the Law Offices of Anthony C. Vitale, counsel for Zen Group, to Defendant Bennett (a copy of which is attached as Exhibit "F" to this Complaint).

51.     Three minutes later, in opposition to the open communication from the MFCU investigators, the Agency's Bennett responded: "I can't comment on this investigation."  January 28, 2020 (12:17 p.m.) Email from Kelly Bennett to Christopher Parrella (a copy of which is attached as Exhibit "G" to this Complaint).  Bennett refused

to provide further information by telephone, as well.  Further, Bennett never responded to the request to terminate the payment suspension based on good cause under the regulation, and never corresponded with Zen Group or its counsel after January 28, 2020.

The MFCU Investigation Determines The Referral From AHCA And Bennett Is Unfounded

52.     On January 29, 2020, the following day, MFCU Investigator Pedro Pidermann corresponded with counsel for Zen Group, and stated:

> Here is an Update of the progress of the investigation.
>
> *-I have spoken with several of the Top 10 Billed Recipient's parents*… so far *everyone has advised* that the *therapy has improved their children's behavior and are very satisfied. They have verified that the therapy billed is correct*.
>
> -I plan on contacting a few more parents of Recipients.
>
> -I spoke with the School Director at Tutor Me Private School in Miami Lakes.. *She confirmed the [Zen Group] RBT is at school every day the Recipient attends & that he remains the entire day. She also advised she reviews all the Progress Notes for accuracy prior to signing them*.
>
> - I will discuss the progress of the Investigation with AAG Jose Marti after I contact a hand full more of Parents….
>
> - I will then contact your office if an interview with the owners of the Zen Group is necessary

*See* January 29, 2020 Email from MFCU Investigator Pedro Pidermann to Anthony C. Vitale, counsel for Zen Group (a copy of which is attached as Exhibit "H" to this Complaint) (emphasis added).

53.     Six days later, on February 4, 2020, Investigator Pidermann provided an update by email to Zen Group's counsel, as follows:

> I've been busy with some other Investigations since Thursday 1/30/2020 … I was out all day yesterday on an other Case… I hope to get to the few more Recipient's parents with the Zen Group by the end of this week… I

> will probably discuss with Asst Attorney General Jose Marti in the early part of next week the findings so far… He & I will collaborate to determine if interviewing your clients is necessary by then… It appears this Case is trending to closing out as Unfounded[.]

*See* February 4, 2020 Email from MFCU Investigator Pedro Pidermann to Anthony C. Vitale, counsel for Zen Group (a copy of which is attached as Exhibit "I" to this Complaint).

54.     In his February 4, 2020 email, MFCU Investigator Pedro Pidermann establishes that Assistant Attorney General Jose Marti was acting in an investigatory capacity in this case.

55.     On the morning of February 18, 2020, Investigator Pidermann provided another update by email to Zen Group's counsel, as follows: "***After discussing the Case with AAG Jose Marti I submitted my Closing Report on Wednesday 2/12 as Closed for Lack of Evidence*** … I asked my Lt. if he had approved it … The Capt. has to Approve it then the Division Chief has to Approve … it should all be done by Friday[.]"     *See* February 18, 2020 Email from MFCU Investigator Pedro Pidermann to Anthony C. Vitale, counsel for Zen Group (a copy of which is attached as Exhibit "J" to this Complaint) (emphasis added).

56.     In his February 18, 2020 email, MFCU Investigator Pedro Pidermann confirms that Assistant Attorney General Jose Marti was acting in an investigatory capacity in this case.

57.     The following week, on Monday, February 24, 2020, Investigator Pidermann provided another update by email to Zen Group's counsel, as follows: "***Everyone in the Chain of Command has Approved the Closing for Lack of Evidence***… the only Approval needed is from the Regional Chief Asst Attorney

General….she should get to it this week sometime[.]"  *See* February 24, 2020 Email from MFCU Investigator Pedro Pidermann to Anthony C. Vitale, counsel for Zen Group (a copy of which is attached as Exhibit "K" to this Complaint) (emphasis added).

58.     Uncontroverted evidence demonstrates the Agency's referral from MPI Chief Kelly A. Bennett was not supported by a credible allegation of fraud.

59.     The following week, on March 5, 2020, in response to an inquiry from Zen Group's counsel, Investigator Pidermann provided the following update:  "I just checked the status again … no change … still awaiting the Approval of Chief Asst Attorney General H. Simmons… The Capt's approval was 2/14… I don't know why the delay… she has been in 7 [&] out of the office the last few weeks[.]"  *See* March 5, 2020 Email from MFCU Investigator Pedro Pidermann to Anthony C. Vitale, counsel for Zen Group (a copy of which is attached as Exhibit "L" to this Complaint).

60.     The Chief Assistant Attorney General to whom Investigator Pidermann referred in his March 5, 2020, email is Hagerenesh Ketema Simmons, Office of the Attorney General, Medicaid Fraud Control Unit, Miami, Florida.

61.     On information and belief, Chief Assistant Attorney General Hagerenesh Ketema Simmons was acting in an investigatory capacity in her review of Investigator Pidermann's findings and recommendations.

62.     On Tuesday, March 17, 2020, in response to another inquiry from Zen Group's counsel requesting a status update, Investigator Pidermann responded: "I just e-mailed the Chief Asst. Attorney General to inquire the status of her review of the Case. When I hear back from her, I'll advise."  *See* March 17, 2020 Email from MFCU

Investigator Pedro Pidermann to Peter Suarez, paralegal for Anthony C. Vitale, counsel

for Zen Group (a copy of which is attached as Exhibit "M" to this Complaint).

After MFCU Investigation Determined The Referral From AHCA And Bennett Was
Unfounded And Awaiting Close-Out, AHCA Sent Two More Baseless Referrals To
MFCU

63.     While waiting for the final close out of the Agency's unfounded fraud

referral, on March 25, 2020, Investigator Pidermann spoke to Zen Group's counsel,

Anthony Vitale, by telephone.  Investigator Pidermann informed Mr. Vitale that the week

prior, the week of March 16-20, Investigator Pidermann's office, i.e., the Medicaid Fraud

Control Unit of the Attorney General's Office, received two packages from AHCA

Medicaid Program Integrity, each referring a purported allegation of fraud.

64.     One of these AHCA MPI referrals related to the very same alleged

overpayment allegation previously brought by AHCA and settled favorably for Zen

Group.  Investigator Pidermann informed Mr. Vitale that the MFCU was disregarding

and/or rejecting this attempted referral by AHCA MPI.

65.     The other AHCA MPI referral related to Zen Group billing regarding a

single patient, T.C., (10 claims in total) for services rendered and billed in 2017, three

years prior to the referral.

66.     Despite the highly suspicious substance and timing of these additional

referrals, Zen Group's growing frustration, and the debilitating effects of providing

services to Medicaid patients without receiving payment from AHCA, in good faith, and

in a hope against hope, Zen Group continued to cooperate fully and willingly with the

MFCU investigations, specious and ill-motivated as they were.  On March 26, 2020, Zen

Group's counsel, Mr. Vitale, sent an email to Assistant Attorney General Jose Marti,

stating:

> Good morning José:
>
> My name is Anthony Vitale. I represent the Zen group regarding the
> investigations that are being conducted by your office.
>
> My understanding is the initial investigation, referred by MPI was
> determined to be unfounded. As you know, my client completely
> cooperated with the initial investigation.
>
> For 3 months, my client has been providing services to autistic children
> without being paid. MPI imposed a payment suspension based on the
> initial referral to MFCU which is still in place.  It was our hope that once
> your investigation was concluded that payments would resume.
>
> We have now learned that MPI has made a repeated referral regarding  a
> settled administrative overpayment  and a stale and baseless three-year old
> allegation regarding 10 Baker act admissions.
>
> I would like you to know that my client will again be completely
> transparent. We are preparing the relevant documentation for your
> consideration and my client is available at your convenience to be
> interviewed. We are again confident the new allegations are completely
> unfounded.
>
> Please call me to discuss my cell is 305 . . . .

*See* March 26, 2020 Email from Anthony C. Vitale, counsel for Zen Group, to Assistant

Attorney General Jose Marti (a copy of which is attached as Exhibit "N" to this

Complaint).

67.     On March 29, 2020, Mr. Vitale transmitted to Assistant Attorney General

Jose Marti, with copies to Luis Martinez, Chief Assistant Attorney General, and MFCU

Investigator Pedro Pidermann, a letter (with attachments) setting out some of the context

in which the AHCA MPI referrals arose, describing the circumstances that indicated

AHCA MPI was issuing referrals to MFCU in bad faith retaliation for Zen Group's

challenge of AHCA's 2019 overpayment demand, and yet again, offering Zen Group's complete and unlimited transparency and cooperation.

68.     On March 30, 2020, Mr. Vitale on behalf of Zen Group sent to AAG Jose Marti by email a copy of an initial investigation report regarding the 2017 billing that was the subject of AHCA MPI's recent referral, a timeline in reverse chronological order regarding the billings at issue, supporting documentation for the billings at issue.  In his email, Mr. Vitale stated: "My clients are prepared to immediately be interviewed, by telephone or at your office and will provide all additional information/documentation requested."  *See* March 30, 2020 Email from Anthony C. Vitale, counsel for Zen Group, to Assistant Attorney General Jose Marti (a copy of which is attached as Exhibit "O" to this Complaint).

69.     Zen Group in fact engaged in no fraudulent billing regarding the AHCA referral pertaining to the 10 claims from 2017.

70.     Documentary and testimonial evidence gathered by MFCU and provided by Zen Group establish that Zen Group engaged in no fraudulent billing, and that the patient associated with the 10 claims at issue in the referral received necessary services for which Zen Group billed.

71.     Assistant Attorney General Jose Marti responded the following day to indicate he had received Mr. Vitale's March 30, 2020, email.

72.     On April 9, 2020, almost three full months after AHCA suspended Medicaid payments to Zen Group, Mr. Vitale wrote to Mr. Marti by email "to inform you [Mr. Marti] that . . . due to MPI's protracted payment suspension the company [Zen Group] is in dire financial condition and at risk of closing," offering to provide "any

additional information or explanation we can provide to assist in your investigation," and urging that "time is of the essence."  *See* April 9, 2020 Email from Anthony C. Vitale, counsel for Zen Group, to Assistant Attorney General Jose Marti (a copy of which is attached as Exhibit "P" to this Complaint).

73.   The following day, April 10, 2020, Mr. Marti responded to Mr. Vitale by email, stating: "[W]e will contact you as soon as we need to request anything."

Zen Group Is Forced Out Of Business Due To AHCA's Withholding Payments Based on Unfounded, False Fraud Referrals From AHCA And Bennett

74.   On Monday, April 13, 2020, in an email carrying the subject, "Zen Group Suspending Services April 15," Mr. Vitale wrote to Mr. Marti as follows:

Thank you for the update.

Unfortunately, as of this Wednesday, April 15, the company will be suspending services to the approximately 60 autistic children and furloughing 50 employees. The company has exhausted all savings and can no longer afford to continue operations.

As you know, [t]he company has not been able to bill for services provided by its analysts and RBT's since January 10, 2020 due to the payment suspension. The company has not been paid by AHCA for services the analysts and RBT's have continued to provide in the last three months although the company has continued to pa[y] its providers.

At this point, the company is financially unable to continue to provide services and pay the dedicated providers and administrative staff.

We believe the MPI referrals are baseless and at the conclusion of the MFCU investigation you will agree. As you know, all investigations you are conducting are based on MPI referrals, and as we have explained all the circumstances suggest[] the MPI referrals are based on AHCA's bad-faith efforts to retaliate against Zen based on a voluntary overpayment settlement.

Under these circumstances, we believe Zen deserves every opportunity to get out from under this unfair cloud of suspicion created by nothing more than unsupported MPI referrals, especially because the cloud of suspicion

alone -- without any evidence of any fraud or wrongdoing by Zen -- requires a payment suspension, and is now forcing Zen out of business.

We would request an opportunity to address any remaining issues or concerns you may have. Again, we are offering to make the owners or any witness you designate immediately available and produce any document to assist the state in resolving this matter expeditiously.

We appreciate the diligence your office is shown.

*See* April 13, 2020 Email from Anthony C. Vitale, counsel for Zen Group, to Assistant Attorney General Jose Marti (a copy of which is attached as Exhibit "Q" to this Complaint).

75.     On April 15, 2020, after cooperating fully and unconditionally with MFCU's investigation and continuing operations relying on MFCU's and AHCA's good-faith in resolving the unfounded investigation expeditiously, after providing essential, medically-necessary services to its vulnerable population of approximately 60 special needs minors for over three months without being paid by AHCA, and after exhausting the personal savings of its owners in paying its staff of more than 50 (average monthly payroll is approximately $250,000), and overhead (approximately $15,000/month), Zen Group severely limited its operations, retaining only four providers delivering services to 10 special-needs patients.

76.     After April 15, 2020, most of Zen Group's patient population, all of whom are vulnerable and some of whom are extremely fragile, were forced to find other treatment options, a process that can take a month under normal circumstances, and longer in the midst of a public health pandemic.   The potentially catastrophic consequences of the break in care for these vulnerable minors is not yet known.

77.     What is known, is that for more than three months – from January 10 to April 15, 2020 – Zen Group provided medically-necessary covered services to Florida Medicaid patients while AHCA withheld payments, thereby forcing Zen Group to accumulate over $800,000.00 in accounts receivable from the Agency during this period.

78.     On April 30, 2020, in response to another inquiry from Mr. Vitale regarding the status of the investigation, Mr. Marti responded, "Unfortunately the answer is still the same, the investigation is ongoing."  *See* April 30, 2020 Email from Assistant Attorney General Jose Marti to Anthony C. Vitale, counsel for Zen Group (a copy of which is attached as Exhibit "R" to this Complaint).

79.     On May 5, 2020, Mr. Marti informed Mr. Vitale by email, "I will be unable to provide a timeline regarding the investigation at this time."  *See* May 5, 2020 Email from Assistant Attorney General Jose Marti to Anthony C. Vitale, counsel for Zen Group (a copy of which is attached as Exhibit "S" to this Complaint).

80.     For the rest of May, no one from AHCA, MFCU or the Attorney General's Office contacted Zen Group or its counsel.

81.     On June 1, 2020, with its owner's resources exhausted by AHCA's payment suspension, Zen Group let its four remaining staff members go, stopped servicing its remaining patients, and completely ceased operations.  As of June 1, 2020, the more than 60 special-needs Medicaid patients Zen Group was treating at the beginning of 2020 were either left without care or needed to try to find new care.

82.     On June 9, 2020, counsel for Zen Group inquired of Assistant Attorney General Jose Marti as to the status of the investigation(s).  Mr. Marti did not respond.

24

83.     Out of money, out of patience, out of business, and out of options, Zen Group commenced the process to bring this lawsuit to remedy the grave consequences of AHCA's false, malicious, retaliatory, and unfounded fraud referral and the Attorney General's Office MFCU's bad-faith refusal to close the meritless investigations.

The Retaliation Continues

84.     On July 1, 2020, during the preparation of this Complaint, Assistant Attorney General Jose Marti sent an email to Mr. Vitale, as counsel for Zen Group, requesting information from Zen Group pertaining to a "list of individuals and dates" compiled by the MFCU.  *See* July 1, 2020 Email from Assistant Attorney General Jose Marti to Anthony C. Vitale, counsel for Zen Group (a copy of which is attached as Exhibit "T" to this Complaint).

85.     On information and belief, the information requested by Assistant Attorney General Jose Marti regarding the list of individuals and dates has nothing to do with any of the three fraud referrals from AHCA that Zen Group was made aware of by MFCU Investigator Pedro Pidermann.

86.   At all times relevant to this complaint Assistant Attorney General Jose Marti has functioned in the capacity as an investigator, and Mr. Marti functioned in the capacity of an investigator with regard to the investigation concerning the list of individuals and dates he identified in his July 1, 2020, email to Mr. Vitale.

87.     On July 6, 2020, the second business day after Assistant Attorney General Jose Marti sent his request for information regarding the list of individuals and dates identified on July 1, Mr. Vitale, on behalf of Zen Group, confirmed to Mr. Marti by email that Zen Group would willingly and voluntarily provide all documents and information

requested without the need of a subpoena.  In this same email of July 6, Mr. Vitale reiterated to Mr. Marti that the AHCA referrals to MFCU were made in bad faith and in retaliation for Zen Group exercise of its First Amendment rights in the settled 2019 AHCA overpayment case.  *See* July 6, 2020 Email from Anthony C. Vitale, counsel for Zen Group, to Assistant Attorney General Jose Marti (a copy of which is attached as Exhibit "U" to this Complaint).

88.     On the same day, July 6, 2020, Assistant Attorney General Jose Marti sent an email to Zen Group's counsel, stating, "[O]ur investigation of Zen Group has been continuous since we first were in contact with your client and no part of our investigation at the Medicaid Fraud Control Unit has been closed to this point."  *See* July 6, 2020 Email From Assistant Attorney General Jose Marti to Anthony C. Vitale, counsel for Zen Group (attached as Exhibit "V" to this Complaint).

89.     Mr. Marti's statement in his July 6 email calls into question the motives of Mr. Marti and those of his boss Ms. Simmons when viewed in the light of the following statements made by MFCU Investigator Pidermann more than four (4) months earlier: (1) On February 18, 2020, Investigator Pidermann stated, "After discussing the Case with AAG Jose Marti I submitted my Closing Report on Wednesday 2/12 as Closed for Lack of Evidence, *see* Exhibit J; (2) On February 24, 2020, Investigator Pidermann stated: "***Everyone in the Chain of Command [including AAG Jose Marti] has Approved the Closing for Lack of Evidence***… the only Approval needed is from the Regional Chief Asst Attorney General [AAG Hagerenesh Ketema Simmons]," *see* Exhibit K (emphasis added).

90.     On July 9, 2020 Zen Group, through its counsel provided all the documents and information requested by Assistant Attorney General Jose Marti in his July 1 email.  The requested information comprised Zen Group service logs, monthly reports, and related records for 105 dates of service consisting of 412 entries.

91.     On information and belief, Mr. Marti's July 1 request does not relate to any of the three prior AHCA referrals Zen Group has been made aware of either by AHCA or MFCU employees.

92.     On information and belief, Mr. Marti's July 1 request represents yet another AHCA referral, ***its fourth separate referral since January***, or another desperate attempt to uncover some Zen Group error or impropriety to justify the now more-than-six-month-old baseless payment suspension that has driven Zen Group to cease business operations.

93.     On information and belief, this latest request is a continuation of AHCA's and Defendant Bennett's retaliatory scheme, another attempt to catch or manufacture some Zen Group mistake or wrongdoing, this time by examining Zen Group patient records on dates when Zen Group provided services and billed AHCA <u>and</u> the same patient had a doctor visit billed to Medicaid.  AHCA appears to be looking for "gotcha" moment.  The records produced to Assistant Attorney General Jose Marti pursuant to his July 1 request demonstrate Zen Group billed properly and engaged in no fraud.

94.     On the afternoon of July 28, 2020, Assistant Attorney General Jose Marti, again in his role as an investigator, sent by email to counsel for Zen Group "a short follow-up [to] the previous information request from Zen Group."  *See* July 28, 2020

Email from Assistant Attorney General Jose Marti to Anthony C. Vitale, counsel for Zen Group (a copy of which is attached as Exhibit "W" to this Complaint).

95.     Mr. Marti's "short follow-up" information request – a follow-up to the information and documentation Zen Group promptly and voluntarily provided in response to Mr. Marti's earlier request relating to 26 patients and the 105 dates of service – sought (1) clarification to documentation relating to four (4) out of the 105 dates of service Zen Group had previously provided information about, and (2) documentation for two new dates of service.

96.     On July 29, 2020, Zen Group provided all of the information and documentation Mr. Marti requested approximately 24 hours after Mr. Marti sent his request.  The documents and information provided to Mr. Marti, again, conclusively establish that Zen Group did not engage in any fraudulent conduct and did not engage in any criminal activity whatever.

97.     Despite the fact that all the requested information expeditiously provided to Mr. Marti exonerates Zen Group, he and MFCU have not closed the investigation and AHCA has not terminated its payment suspension.

AHCA's And Bennett's Responsibilities Under Chapter 455 Of The Code Of Federal Regulations

98.     Pursuant to Section 455.23 of Title 42 of the Code of Federal Regulations, a State Medicaid agency, AHCA in Florida, must suspend Medicaid payments to a provider "after the agency determines there is a credible allegation of fraud for which an investigation is pending . . . unless the agency has good cause to not suspend payments . . . ."

28

A credible allegation of fraud may be an allegation, ***which has been verified by the State***, from any source, including but not limited to the following:

(1) Fraud hotline complaints.

(2) Claims data mining.

(3) Patterns identified through provider audits, civil false claims cases, and law enforcement investigations. Allegations are considered to be credible when they have indicia of reliability and the State Medicaid agency has reviewed all allegations, facts, and evidence carefully and acts judiciously on a case-by-case basis.

42 C.F.R. § 455.2 (emphasis added).

99.     "Fraud means an ***intentional*** deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or some other person. It includes any act that constitutes fraud under applicable Federal or State law."   42 C.F.R. § 455.2 (emphasis added); *see also* § 409.913, Fla. Stat. (2018).

100.    The federal Centers For Medicare & Medicaid Services ("CMS") has stated that 'billing errors" do not justify suspension under the 42 C.F.R. § 455.23.

101.    Section 455.13 requires the Medicaid agency to have "(a) Methods and criteria for identifying suspected fraud cases; (b) Methods for investigating these cases that – ***(1) Do not infringe on the legal rights of persons involved; and (2) Afford due process of law***." (emphasis added).

102.    "If the agency receives a complaint of Medicaid fraud or abuse from any source or identifies any questionable practices, ***it must conduct a preliminary investigation to determine whether there is sufficient basis to warrant a full investigation***."   42 C.F.R. § 455.14 (emphasis added).

103.    In sum, Chapter 455 of Title 42 of the Code of Federal Regulations permits AHCA to suspend payments to a provider only if (1) there is an allegation that has been "verified" by the agency, and (2) determined to be credible – (3) through an established method for investigating cases that (a) does not infringe on the provider's legal rights and (b) affords the provider due process of law – (4) that the provider committed "fraud," an "intentional deception made with knowledge that the deception could result in some unauthorized benefit."   These regulations, promulgated pursuant to section 6402(h)(2) of the Patient Protection and Affordable Care Act of 2010, codify Medicaid provider rights to not have Medicaid payments for covered services suspended by the State Medicaid agency except upon an actual, verified, credible allegation of fraud.

104.    In adopting 42 C.F.R. § 455.23, CMS addressed comments about how destructive a temporary suspension could be to a provider and how lightly an allegation could be made against a provider, stating:  "We continue to believe that State agencies must review all allegations, facts, and evidence carefully and **act judiciously** on a case-by-case basis when contemplating a payment suspension, **mindful of the impact that payment suspension may have upon a provider.**" *See* Medicare, Medicaid, and Children's Health Insurance Programs; Additional Screening Requirements, Application Fees, Temporary Enrollment Moratoria, Payment Suspensions and Compliance Plans for Providers and Suppliers, 76 Fed. Reg. 5862-01, at 5932 (emphasis added); *see also id.* at 5936 (CMS stated: "**Due to the potential for not just false allegations, but also for good faith mistakes, misunderstandings, and misinterpretations regarding reports of alleged fraud as well as data analysis errors, we encourage States not to rely on any singular allegation or data run but rather States should review all allegations,**

**facts, and data carefully and act judiciously on a case-by-case basis, mindful of the potential impact a payment suspension may have on a provider.**") (emphasis added); *Id.* at 5938 ("In this rule we encourage State agencies to suspend payment based upon pending investigations of credible allegations of fraud **only after reviewing all of the facts and circumstances surrounding a particular case and making a determination that such suspension is in fact warranted**.") (emphasis added).

105.    Further, with regard to the potentially destructive power of State Medicaid agencies' suspensions under 42 C.F.R. § 455.23, CMS made clear that it trusted state agencies to apply the rather vague regulation because in 20 years of administering the previous suspension regulation, CMS had not encountered state agencies acting for improper and illicit motives in issuing suspensions. *See* 76 Fed. Reg. 5862-01, at 5932.

106.    For any "credible allegation of fraud" properly referred to and accepted by MFCU section 455.23(d)(3)(ii) requires:  "On a quarterly basis, the State must request a certification from the Medicaid fraud control unit or other law enforcement agency that any matter accepted on the basis of a referral continues to be under investigation thus warranting continuation of the suspension."

107.    CMS commented that in its rule codified at section 455.23, CMS "emphasized that payment suspensions should be temporary and we [CMS] noted the profound impact that a payment suspension can have upon a provider. We believe that the quarterly reporting and certification process is an important protection for providers to ensure that suspensions do not continue after law enforcement has concluded its investigation but did not report this information to the State Medicaid agency." Medicare, Medicaid, and Children's Health Insurance Programs; Additional Screening

Requirements, Application Fees, Temporary Enrollment Moratoria, Payment Suspensions and Compliance Plans for Providers and Suppliers, 76 Fed. Reg. 5862-01 at 5939.

108.　Finally, 42 C.F.R. § 455.23(g) requires AHCA to retain for five years all records relating to its referral to MFCU, and all MFCU's quarterly certifications of continuing investigation.

**COUNT I – Claim Pursuant To 42 U.S.C. § 1983 For Violation Of Right To Free Speech And Right To Petition Government For Redress Under The First Amendment To The United States Constitution Against Defendants AHCA, Mayhew, and Bennett**

109.　Zen Group realleges and reavers the allegations contained in paragraph 1 through 108 above as if fully set forth herein.

110.　Zen Group exercised its First Amendment right to petition the government for redress when it sought administrative review of AHCA's overpayment demand in the FAR.  This speech and act was constitutionally protected.

111.　Zen Group exercised its First Amendment right to free speech and to criticize the government when it served upon AHCA a motion for sanctions criticizing the Agency for its botched implementation of the Behavior Analysis Services program, its unfair and arbitrary administration of the Behavior Analysis Services program, and its attempt to impose arbitrary, capricious, unfair post-hoc non-rule policies on Zen Group and other providers.  This speech and act was constitutionally protected.

112.　At the time they took vindictive retaliatory action against Zen Group by imposing an unfounded payment suspension, Defendants AHCA, Mayhew, and Bennett were aware Zen Group had exercised of its First Amendment rights to petition the government for redress in seeking administrative review of AHCA overpayment demand.

32

113. At the time they took vindictive retaliatory action against Zen Group by imposing an unfounded payment suspension, Defendants AHCA, Mayhew and Bennett, were aware Zen Group had exercised its First Amendment rights to free speech and to criticize the government by serving upon AHCA a motion for sanctions criticizing the Agency for its botched implementation of the Behavior Analysis Services program, its unfair and arbitrary administration of the Behavior Analysis Services program, and its attempt to impose arbitrary, capricious, unfair post-hoc non-rule policies on Zen Group and other providers.

114. Defendants AHCA, Mayhew, and Bennett, suspended Medicaid payments to Zen Group without a true and proper verified credible allegation of fraud because of, and in retaliation for, Zen Group exercising its First Amendment rights to free speech and to criticize the government (namely Defendants AHCA and Bennett) and for Zen Group's exercise of its First Amendment right to petition the government for redress.

115. The intentional retaliatory conduct of Defendants AHCA, Mayhew, and Bennett, of suspending Medicaid payments to Zen Group in the absence of a bona fide, verified "credible allegation of fraud" constitutes "retaliatory conduct" and would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

116. Defendants AHCA, Mayhew, and Bennett caused an adverse effect on Zen Group by suspending Medicaid payments to Zen Group in the absence of a bona fide, verified "credible allegation of fraud," thereby causing Zen Group to lose patients, lose business, and eventually to cease business operations.

117.    Zen Group was damaged by Defendant AHCA's, Defendant Mayhew's, and Defendant Bennett's retaliatory conduct in suspending Medicaid payments to Zen Group in retaliation for Zen Group's exercise of its First Amendment rights.

118.    Zen Group was damaged by Defendant AHCA's, Defendant Mayhew's, and Defendant Bennett's retaliatory conduct in suspending Medicaid payments to Zen Group in retaliation for Zen Group's exercise of its First Amendment rights by the loss of business and loss of patients.

119.    Zen Group was damaged by Defendant AHCA's, Defendant Mayhew's, and Defendant Bennett's retaliatory conduct in suspending Medicaid payments to Zen Group in retaliation for Zen Group's exercise of its First Amendment rights in that Zen Group was forced to cease business operations.

120.    As a proximate result of the aforementioned violation of Constitutional rights, Plaintiffs have been damaged and have sustained compensatory damages including but not limited to, lost wages, lost profits, emotional distress, pain and suffering, damage to reputation.

**WHEREFORE**, Plaintiffs hereby request this Court award compensatory damages, including but not limited to, lost wages, lost profits, emotional distress, pain and suffering, damage to reputation, attorneys' fees and costs, and any and all compensatory and equitable relief this Court deems just.

### COUNT II – Declaratory Judgment Against Defendants AHCA, Mayhew, and Bennett

121.    Zen Group realleges and reavers the allegations contained in paragraph 1 through 108 above as if fully set forth herein.

122.    Sections 2201 and 2202 of Title 28 of the United States code authorize federal courts to declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought, and to order such further necessary or proper relief based on a declaratory judgment.

123.    Chapter 86 of the Florida Statutes authorizes Florida courts to issue declaratory judgments on the existence or nonexistence of any immunity, power, privilege, or right, or of any fact upon which the existence or nonexistence of such immunity, power, privilege, or right does or may depend.

124.    Zen Group seeks a declaratory judgment by this Court that no verified "credible allegation of fraud" justifies the payment suspension AHCA has imposed on Zen pursuant to 42 C.F.R. § 455.23.

125.    Federal regulations at 42 C.F.R. § 455.23 permit AHCA to suspend Medicaid payments to a contracted provider upon a verified "credible allegation of fraud."

126.    Defendants AHCA, Mayhew, and Bennett have suspended Medicaid payments to Zen Group based upon a purported "credible allegation of fraud."

127.    Zen Group seeks a declaration that the present facts and circumstances do not constitute a "credible allegation of fraud" as that term is used in 42 C.F.R. § 455.23.

128.    Zen Group has a bona fide, actual, present practical need for the declaration because AHCA is withholding significant payments to Zen Group based upon nothing more than AHCA's improper and untrue assertion of a "credible allegation of fraud."

129.     Zen Group's right to timely reimbursement for services provided to Florida Medicaid recipients has been adversely affected by Defendant AHCA's, Defendant Mayhew's, and Defendant Bennett's unilateral and erroneous assertion of a "credible allegation of fraud."

130.     Zen Group has an actual and present interest in the declaration sought and Zen Group's interest is adverse and antagonistic to AHCA and/or rogue agents of AHCA, such as Defendant Bennett.

131.     The dispute between Zen Group and Defendants AHCA, Mayhew, and Bennett over whether Defendants' referral to MFCU was based on a legally sufficient verified "credible allegation of fraud" is definite and concrete issue, touching the legal relations of parties having adverse legal interests.  The facts alleged show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

**WHEREFORE**, Plaintiffs seek an Order from this Court declaring (1) that Defendants' payment suspension imposed on Zen Group purportedly based on 42 C.F.R. § 455.23 violates the law and is not based on a verified "credible allegation of fraud"; (2) that Defendants must immediately terminate the illegal payment suspension; (3) that Plaintiffs are entitled to attorneys' fees and costs in prosecuting this matter; and (4) that Plaintiffs are entitled to such other relief as this Court deems just and proper.

### COUNT III – Florida State Law Claim For Tortious Interference With Business Relations Against Defendant Bennett

132.     Zen Group realleges and reavers the allegations contained in paragraph 1 through 108 above as if fully set forth herein.

133.    Zen Group was and is in a business relationship with the State of Florida, Agency for Health Care Administration.

134.    Defendant Bennett, Chief of the Office of Medicaid Program Integrity in the Division of Health Quality Assurance within the AHCA, knew of, and knows of, the business relationship between Zen Group and the Agency.

135.    Defendant Bennett intentionally and unjustifiably interfered with the business relationship between Zen Group and the Agency.

136.    Defendant Bennett acted outside the scope of agency and not in the Agency's or the State's best interests in interfering with the business relationship between Zen Group and the Agency.

137.    As a proximate result of the aforementioned tortious interference with the business relationship, Plaintiffs have been damaged and have sustained compensatory damages including but not limited to, lost wages, lost profits, emotional distress, pain and suffering, damage to reputation and such other additional equitable relief as may be just and proper.

**WHEREFORE**, Plaintiffs hereby request this Court award compensatory damages, including but not limited to, lost wages, lost profits, emotional distress, pain and suffering, damage to reputation, attorneys' fees and costs, and any and all compensatory and equitable relief this Court deems just.

### COUNT IV – Florida State Law Claim For Defamation
### Against Defendant Bennett

138.    Zen Group realleges and reavers the allegations contained in paragraph 1 through 108 above as if fully set forth herein.

139.     Defendant Bennett published to Pedro Pidermann and/or other employees of the Medicaid Fraud Control Unit of the Attorney General's Office a false claim that Bennett and/or AHCA's Office of Medicaid Program Integrity had received a verified "credible allegation of fraud" against Zen Group.

140.     Defendant Bennett's published statement to Pedro Pidermann and/or other employees of the Medicaid Fraud Control Unit of the Attorney General's Office about a verified "credible allegation of fraud" against Zen Group was false.

141.     Defendant Bennett published her statement to Pedro Pidermann and/or other employees of the Medicaid Fraud Control Unit of the Attorney General's Office about a verified "credible allegation of fraud" against Zen Group with knowledge that the statement was false or at least negligently as to the falsity of the statement.

142.     Defendant Bennett's false published statement to Pedro Pidermann and/or other employees of the Medicaid Fraud Control Unit of the Attorney General's Office about a verified "credible allegation of fraud" against Zen Group was defamatory in that it implicated Zen Group in criminal conduct amounting to a felony.

143.     Defendant Bennett's false published statement to Pedro Pidermann and/or other employees of the Medicaid Fraud Control Unit of the Attorney General's Office about a verified "credible allegation of fraud" against Zen Group was defamatory in that it tended to injure Zen Group in its trade or profession.

144.     Zen Group has suffered actual damages caused by Defendant Bennett's false published statement to Pedro Pidermann and/or other employees of the Medicaid Fraud Control Unit of the Attorney General's Office about a verified "credible allegation of fraud" against Zen Group.

145.    Defendant Bennett's false published statement to Pedro Pidermann and/or other employees of the Medicaid Fraud Control Unit of the Attorney General's Office about a verified "credible allegation of fraud" against Zen Group caused reputational damages to Zen Group.

146.    Defendant Bennett's false published statement to Pedro Pidermann and/or other employees of the Medicaid Fraud Control Unit of the Attorney General's Office about a verified "credible allegation of fraud" against Zen Group caused a suspension of Medicaid payments to Zen Group that has lasted more than six months.

147.    Defendant Bennett's false published statement to Pedro Pidermann and/or other employees of the Medicaid Fraud Control Unit of the Attorney General's Office about a verified "credible allegation of fraud" against Zen Group has caused Zen Group to lose existing patients and income associated with treating them.

148.    Defendant Bennett's false published statement to Pedro Pidermann and/or other employees of the Medicaid Fraud Control Unit of the Attorney General's Office about a verified "credible allegation of fraud" against Zen Group has caused Zen Group to lose new patients and income associated with treating them.

149.    Defendant Bennett's false published statement to Pedro Pidermann and/or other employees of the Medicaid Fraud Control Unit of the Attorney General's Office about a verified "credible allegation of fraud" against Zen Group has caused Zen Group to cease its business operations.

150.    Zen Group's owner Carlos Otamendi has suffered actual damages caused by Defendant Bennett's false published statement to Pedro Pidermann and/or other

employees of the Medicaid Fraud Control Unit of the Attorney General's Office about a verified "credible allegation of fraud" against Zen Group.

151.    Zen Group's owner Carlos Otamendi has suffered reputational, mental, and emotional damages caused by Defendant Bennett's false published statement to Pedro Pidermann and/or other employees of the Medicaid Fraud Control Unit of the Attorney General's Office about a verified "credible allegation of fraud" against Zen Group.

152.    Pursuant to section 770.01 of the Florida Statutes, Plaintiffs have served in writing upon Defendants, including upon Defendants AHCA and Bennett, at least five (5) days prior to instituting this civil action, notice specifying the publication and statements therein alleged to be false and defamatory.

153.    As a proximate result of the aforementioned defamation, Plaintiffs have been damaged and have sustained compensatory damages including but not limited to, lost wages, lost profits, emotional distress, pain and suffering, damage to reputation, and seek compensatory damages and such other additional equitable relief as may be just and proper.

**WHEREFORE**, Plaintiffs hereby request this Court award compensatory damages, including but not limited to, lost wages, lost profits, emotional distress, pain and suffering, damage to reputation, attorneys' fees and costs, and any and all compensatory and equitable relief this Court deems just.

### COUNT V – Florida State Law Claim For Outrageous Conduct Causing Severe Emotional Distress Against Defendant Bennett

154.    Zen Group realleges and reavers the allegations contained in paragraph 1 through 108 above as if fully set forth herein.

155.    Defendant Bennett acted extremely and outrageously in providing false information to Pedro Pidermann and/or other employees of the Medicaid Fraud Control Unit of the Attorney General's Office about a purported verified "credible allegation of fraud" against Zen Group and Carlos Otamendi that caused Carlos Otamendi severe emotional distress.

156.    Said actions by Defendant Bennett go beyond all possible bounds of decency as is to be regarded as shocking, atrocious, and utterly intolerable in a civilized community.

157.    As a proximate result of the aforementioned outrageous conduct on the part of Defendant Bennett, Plaintiffs have been damaged and have sustained compensatory damages including but not limited to, lost wages, lost profits, emotional distress, pain and suffering, damage to reputation and seek compensatory damages and such other additional equitable relief as may be just and proper.

**WHEREFORE**, Plaintiffs hereby request this Court award compensatory damages, including but not limited to, lost wages, lost profits, emotional distress, pain and suffering, damage to reputation, attorneys' fees and costs, and any and all compensatory and equitable relief this Court deems just.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues triable of right by a jury.

Respectfully submitted,

**THE HEALTH LW OFFICES OF**
**ANTHONY C. VITALE P.A.**
Anthony C. Vitale, Esq.
Florida Bar No. 249841
2333 Brickell Avenue, Suite A-1
Miami, Florida 33129
(305) 358-4500 telephone
(305) 358-5113 facsimile
avitale@vitalehealthlaw.com

**ELLSWORTH LAW FIRM, P.A.**
Sean M. Ellsworth, Esq.
Florida Bar No. 039845
1000 5th Street, Suite 223
Miami Beach, Florida 33139
(305) 535-2529 telephone
(305) 535-2881 facsimile
sean@ellslaw.com

_____/s/_____
Sean M. Ellsworth
Florida Bar No. 39845